## HALLIDAY *v.* UNITED STATES.

No. 101.   Argued January 5, 1942.—Decided January 19, 1942.

*Messrs. R. K. Wise* and *Warren E. Miller* for petitioner.

*Mr. Wilbur C. Pickett,* with whom *Solicitor General Fahy* and *Messrs. Julius C. Martin, Fendall Marbury,* and *W. Marvin Smith* were on the brief, for the United States.

Mr. Justice Byrnes delivered the opinion of the Court.

This is a suit brought by the petitioner, through his Committee, on a $10,000 War Risk Insurance policy. The complaint alleged that petitioner had become permanently and totally disabled by April 2, 1919, the date on which he was honorably discharged by the Army. The insurance contract was in effect on that date and remained in effect until October 31, 1920. At the close of all the evidence, the Government's motion for a directed verdict was denied. The jury returned a verdict for petitioner and found that he had become permanently and totally disabled by April 2, 1919. The Government moved for a new trial, the motion was denied, and judgment was entered on the verdict. On appeal the Circuit Court of Appeals reversed. 116 F. 2d 812. It held that there was insufficient evidence to go to the jury and it remanded the case to the District Court with directions to set aside the verdict and to enter judgment in favor of the Government.

Petitioner sought certiorari on two grounds: that the Circuit Court of Appeals had erred in holding that there was insufficient evidence for the jury; and that, even if the evidence was insufficient, under Rule 50 (b) of the Rules of Civil Procedure [1] the Circuit Court was without

---

[1] "Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Within 10 days after the reception of a verdict, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict. A motion for a new trial may be joined with this motion, or a new

power to direct entry of judgment for the Government without a new trial. We granted certiorari, as we had in *Berry* v. *United States* [2] and *Conway* v. *O'Brien*,[3] because of the importance of the question concerning Rule 50 (b). However, as in those cases, we do not reach that problem, since we are of the opinion that the evidence was sufficient to support the verdict.

The insurance contract, the Act of Congress which authorized it,[4] and the regulations issued pursuant to that Act [5] obliged petitioner to prove that he was permanently and totally disabled on or before October 31, 1920, the date of expiration of the contract. We think there was evidence from which, if believed, the jury could have drawn this conclusion.

*Period prior to October 31, 1920.* Petitioner appeared to his friends and neighbors as a normal and healthy young man before his induction into the Army on June 23, 1918. In August he sailed for France, and in September he injured his back and was admitted to a camp hospital. From that time until his discharge, he was examined on several occasions by Army physicians. Their reports reveal that he was "very nervous" and that he gave "impressions of neurasthenia."

While much of the testimony was not specific as to time, several of the witnesses described the appearance and

---

trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed. If no verdict was returned the court may direct the entry of judgment as if the requested verdict had been directed or may order a new trial."

[2] 312 U. S. 450.

[3] 312 U. S. 492.

[4] War Risk Insurance Act of October 6, 1917, c. 105, § 402, 40 Stat. 409.

[5] Bulletin No. 1, Treasury Department, Regulations & Procedure, United States Veterans' Bureau, Volume II, pp. 1233–1237.

behavior of the petitioner immediately following his discharge in April, 1919. The jury was clearly warranted in regarding their testimony as applicable to the period during which the insurance policy remained in force.

Dr. J. N. Land, a general practitioner who had been "the family physician of the Halliday family" and who had known petitioner from infancy, testified that, from 1919 on, petitioner was the victim of psychoneurosis and hypochondria. These ills caused him to talk about himself constantly, to imagine the existence of symptoms, and to become very unfriendly and suspicious. The witness "would not have advised him to do any work since he has been out of the Army," and was of the opinion that work "would have been harmful to him" and would have resulted in "a complete collapse." At the time of his discharge from the Army, the doctor "didn't hold any hope for his recovery." The Circuit Court of Appeals considered this testimony of "little probative force," chiefly because of Dr. Land's admission that he had not examined petitioner professionally until about 1932. But the doctor testified that he had seen petitioner "on the streets or in a drugstore" "at least two or three times a year, possibly more . . . all the way from 1919." Petitioner talked to him "every chance he has got since 1919." In the course of these conversations petitioner would describe his condition at length and ask the witness to do something for him. While the Circuit Court may have regarded the probative force of this evidence as "little," it was clearly proper for the jury to conclude from it and from their understanding of small town life that these encounters and his earlier intimacy with the Halliday family afforded Dr. Land an opportunity to form a reliable estimate of petitioner's condition.

Other witnesses, including his wife and brothers and neighbors, testified that when he returned from the war petitioner "was suspicious of everybody," "didn't seem to

be the same man," "seemed to be a man that didn't have a grip on himself," "didn't have the best control of himself." They described him as "a physical wreck," "nervous," "not right," "a complete physical and mental wreck, very badly torn up physically and mentally." And one brother testified that petitioner's condition upon his return was "practically the same as it is today."

*Period following October 31, 1920.* While it is true that total and permanent disability prior to the expiration of the insurance contract must be established, evidence as to petitioner's conduct and condition during the ensuing years is certainly relevant. It is a commonplace that one's state of mind is not always discernible in immediate events and appearances, and that its measurement must often await a slow unfolding. This difficulty of diagnosis and the essential charity of ordinary men may frequently combine to delay the frank recognition of a diseased mind. Moreover, the totality and particularly the permanence of the disability as of 1920 are susceptible of no better proof than that to be found in petitioner's personal history for the ensuing 15 years.[6]

Petitioner's wife testified that during this period he was unable to do a full day's work, that he threatened to commit suicide and to kill her and their children, and that he feared attempts to poison him. She stated that, although they rented one farm and later bought but never paid for another, they hadn't "done any farming much" and had "just had little patches," and that she and hired hands had been responsible even for this limited enterprise. Dr. Land testified that the mental disorder had gradually progressed since the war.

---

[6] The trial judge instructed the jury: "All of this evidence as to his condition in later years, however, is to be considered by you for the purpose of determining whether the insured became in fact permanently and totally disabled on or before April 2, 1919, or before August, September, or October, 1920,"

The reports of government medical examiners and the records of government hospitals reveal a diagnosis of hypochondria on February 14, 1921. And on November 24, 1925 petitioner was found to be psychoneurotic and neurasthenic. On that date, he informed the medical examiner that he was unable to work, that he lacked confidence, and that he was often depressed and seized by fear. He complained of "a great many things which physical examination fails to reveal." Reports of subsequent examinations up to and including April 11, 1935, contain similar information and diagnoses. Finally on December 9, 1935, at the instance of Dr. Land, petitioner was adjudged incompetent by a county probate court and his wife was appointed as a committee to handle his affairs.

In support of its conclusion, the Circuit Court of Appeals observed that "insured's failure to secure adequate hospitalization" leaves it "highly speculative whether insured's ailments, whatever these may have been, would not have been cured by the medical treatment which was in his potential grasp." There can be no doubt that evidence of the failure of attempted treatment would have been highly persuasive of the permanence of petitioner's disability. And the jury was entitled to draw inferences unfavorable to his claim from the absence of such evidence. However, this was but one of the many factors which the jury was free to consider in reaching its verdict. In the face of evidence of a mental disorder of more than 15 years duration, it can hardly be said that the absence of this single element of proof was fatal to petitioner's claim. Moreover, inferences from failure to seek hospitalization and treatment must be drawn with the utmost caution in cases of mental disorder, where, as here, there is reason to believe that one of the manifestations of the very sickness itself is fear and suspicion of hospitals and institutions.

Although it was unnecessary to its disposition of the case, the Circuit Court of Appeals considered and noted

its agreement with the Government's objection to the District Court's refusal to admit evidence of petitioner's condition subsequent to December 9, 1935, the date on which petitioner was adjudged incompetent by the county probate court.[7] We think that the District Court's ruling was erroneous, but there is nothing to show that it was seriously prejudicial to the Government. Neither in the District Court nor in this Court has the Government suggested its ability to produce evidence from the period subsequent to 1935 which would substantially alter the state of the record.

The case is remanded to permit the reinstatement of the judgment of the District Court.

*Reversed.*

MR. JUSTICE ROBERTS and MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

---

[7] The same ruling was embodied in the instructions to the jury.