## UNITED STATES v. PORTLAND TRUST & SAVINGS BANK.

### No. 10458.

Circuit Court of Appeals, Ninth Circuit.

### Feb. 7, 1944.

### Rehearing Denied March 17, 1944.

Francis M. Shea, Asst. Atty. Gen., Lester P. Schoene, Director, Bureau of War Risk Litigation, Wilbur C. Pickett, Asst. Director, Bureau of War Risk Litigation, Keith L. Seegmiller, Atty., Department of Justice, all of Washington, D. C., Carl G. Donaugh, U. S. Atty., of Portland, Or., and Thomas Lynch, Asst. U. S. Atty., of San Francisco, Cal., for appellant.

Allan A. Bynon and Gerald J. Meindl, both of Portland, Or., for appellee.

Before WILBUR, GARRECHT, and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

Two questions are presented in this appeal: (1) Whether there is any substantial evidence to show that the insured was an "insane person" within the meaning of § 19 of the World War Veterans' Act, 38 U.S.C.A. § 445, on July 3, 1931; and (2) whether there is any substantial evidence that the insured was totally and perman-

ently disabled on or prior to August 31, 1920.

A policy of yearly renewable term insurance was issued to William V. Mahoney on December 7, 1917, and premiums were paid upon it until August 1, 1920. Protection under the policy expired on August 31, 1920, at the termination of the grace period for payment of the premium due on August 1, 1920. Twenty-one years later, on July 28, 1941, a claim for benefits under the policy was filed in the Veterans' Administration, alleging that the insured had become totally and permanently disabled while the policy was in force. The claim was denied on November 3, 1941, and the present suit was brought on November 19, 1941.

The policy sued upon was issued pursuant to the provisions of the War Risk Insurance Act of October 6, 1917, and insured against death or permanent and total disability (c. 105, 40 Stat. 398, 409; 38 U.S.C.A. § 511) occurring during the life of the contract.

Section 19 of the World War Veterans' Act, as amended July 3, 1930, c. 849, § 4, 46 Stat. 992, 38 U.S.C.A. § 445, provides in part as follows: "No suit on yearly renewable term insurance shall be allowed under this section unless the same shall have been brought within six years after the right accrued for which the claim is made or within one year after the date of approval of this amendatory Act, whichever is the later date, * * *: Provided, That for the purposes of this section it shall be deemed that the right accrued on the happening of the contingency on which the claim is founded: Provided further, That this limitation is suspended for the period elapsing between the filing in the bureau of the claim sued upon and the denial of said claim by the director. Infants, insane persons, or persons under other legal disability, or persons rated as incompetent or insane by the bureau shall have three years in which to bring suit after the removal of their disabilities. * * * "

In an effort to avoid the bar of the limitation set forth in the foregoing provision, which otherwise would have fallen on July 3, 1931, the appellee alleged in its petition that the insured had been insane and incompetent continuously since May 22, 1920, and that he was rated by the Veterans' Administration as insane and incompetent prior to July 3, 1931. In its answer, the appellant denied the alleged occurrence of total and permanent disability while the insurance was in force, and likewise denied the allegations with respect to insanity and incompetency.

In accordance with a pretrial agreement, the case was tried upon the issues of whether the insured was insane, or was rated by the Veterans' Administration as insane, on or prior to July 3, 1931, and whether he became totally and permanently disabled on or prior to August 31, 1920. A jury trial on these issues resulted in a general verdict for the appellee, in addition to affirmative answers by the jury to special interrogatories as to whether the insured was insane on July 3, 1931, and totally and permanently disabled while his insurance was in force. The judgment appealed from rests upon that verdict. Reversal is sought on the ground that there is no substantial evidence to support a finding for the appellee on either of the issues. The points were raised in the court below by the appellant's motions for dismissal and for a directed verdict at the close of all the evidence, and its post-verdict motion for judgment, all of which were denied.

■ The appellee introduced the official records of the insured's military service, showing that the latter was a laborer, 21 years of age, at the time of his enlistment on July 15, 1917. He was discharged on May 22, 1920. The records show that on the day of the armistice, November 11, 1918, three sacks of potatoes fell upon the head of the insured, causing simple fracture of a number of his vertebrae, apparently the tenth, eleventh, and twelfth dorsal, and deviation of the first, second, and third lumbar, and possibly the ninth dorsal.

Hospital treatment for the insured was continued from the time of his injury to the date of his discharge from the service, with the exception of two furloughs—one from October 30, 1919 to January 10, 1920, and the other from January 17 to 24, 1920.

With a cast or brace, Mahoney was able to sit up and walk about although unable to help himself in such matters as getting up and down, dressing or wrapping his leggings. On February 28, 1920, extreme nervousness, bordering on hysteria, was noted.

In May, 1920, at the time of his discharge, a board of medical officers found that the insured "was unfit for service as a soldier" because of his injuries, and that "the disqualifying disability did not exist

prior to enlistment and did originate in line of duty."

Three brothers and a sister of the insured were called by the appellee to describe his condition while he was home in Minot, N. D., on furlough, in the latter part of 1919 and the early part of 1920.

John H. Mahoney testified that when the insured returned home he met him at the train, finding him bent over and crippled, and wearing a brace around his body to support his back; that the insured said his back hurt him; that he appeared to be in pain; and that he walked home instead of riding in a cab because he couldn't sit down in a cab. This witness testified that during the stay of the insured members of the family assisted him in shaving, dressing and removing the brace and putting it back on. He further testified that the insured was changed considerably; that he was irritable and nervous, very touchy, and seemed to be bothered by everything; that he sat around the house with a stare on his face, frequently not answering until spoken to several times; that he seemed not to want to talk to any one, and when talking his speech was rambling, and he would switch from one subject to another. He testified that the insured seemed to be unsociable, getting down town only once in a while, and desiring to return home on each occasion after about twenty minutes.

The other two brothers and the sister testified substantially to the same effect regarding the appearance and the conduct of the insured while he was home on furlough.

Mahoney's appearance and demeanor upon his discharge from service in May, 1920, were described by two brothers of the insured and by his wife.

James E. Mahoney testified that the insured was irritable, feeling that he was getting the worst of things; that he took no interest in anything; that his conversation slipped from one subject to another; that in general he was less sociable than before the war, having no real friends as he formerly had; that there was a decided change in his feeling as to whether people were against him. The witness said that he saw his brother again in 1923 and in 1927, and that the latter's condition seemed the same as in 1920.

Francis P. Mahoney testified that after the insured returned from service he was irritable and "awfully nervous," and that "he acted funny." Francis did not think, however, that his brother at that time was insane. He said that he saw his brother again in Minot in 1927, and that the latter's condition was about the same as it was in 1920.

The wife of the insured testified that she was married to the insured on May 27, 1920, five days after his discharge from service; that she knew him before his enlistment, at which time he was in good health and was employed as a bricklayer; and that she had kept in touch with him during his service. According to her testimony, the insured was irritable, not so strong as he used to be, lighter in weight, and not "really well since he was discharged." She said that after his return from the army her husband worked for the Northern States Power Company for about a year.

Three of the insured's fellow-employees at the power company in Minot testified as to his habits and his work record.

A. E. Abbott said that he started to work for the company at Minot in February, 1921, and that he worked with the insured up to the time that the latter left the concern, in the summer or fall of that year. He said that the insured was office boy, doing odd jobs around the office, such as filing and making addressograph plates; that he was commonly known among the employees as "Dizzy Mahoney"; that frequently he was found in some out of the way place, amusing himself by staring out of the window or playing with some small object, such as an eraser or a pencil; that he was peculiar in that he was by himself, did not associate with fellow-employees except to the extent that he did the work assigned to him, "and if you wanted him look for him and give him another job and he would complete that."

Walter C. Dooley testified that he entered the employ of the company in October, 1921, and was acquainted with the insured until the latter resigned. He said that the insured seemed to be physically handicapped; that definitely he did not associate with other employees; that he spent time in the basement or hiding in the vault so that the others could not find him. Dooley further stated that Slocum, the assistant superintendent, frequently engaged in heated argument with Mahoney, which was mostly "kidding" or "perhaps picking on him because he was easily picked on," and that on one such occasion the manager told

Mahoney "that he had better lay off Slocum," who weighed about 250 pounds while Mahoney weighed about 130 or 135. Mahoney, according to the witness, replied that he would "cut Slocum down to his size." Dooley further testified that the insured thought Miss Brogan and Miss Tice, employees of the power company, had a violent dislike for him and were trying to get his job or make life miserable for him.

J. A. Hennessy testified that he was chief clerk in the company's accounting office at Minot while the insured was employed there, and that to a great extent he directed the work of the insured and had charge of his activities. He said that Mahoney was an "aloner," frequently found staring out of the window or into space; that he seemed to take a prejudice against certain people and was difficult to handle, and had a "peculiar temperament."

Two medical reports dealing with Mahoney's condition during his employment at the power company were introduced in evidence. Both stated that vocational training was feasible for him. Apparently he resigned his position to enter such training, starting at Seattle, Washington, on January 9, 1922. This training continued until May 8, 1924, with an interruption in January, 1924. The insured completed a course in accounting.

The appellee introduced evidence of Mahoney's condition from 1922 to 1934, consisting primarily of reports of medical examinations made during the interval between those dates. In addition, there was lay testimony as to the appearance of the insured on a few short and widely separated occasions between 1922 and 1927.

In addition to details regarding the condition of Mahoney's injured back, the medical reports, starting with those compiled in the latter part of 1932, made frequent mention of the mental condition of the insured. At first there were references to Mahoney's "apprehension and self-concern," and the statement that "Epileptoid seizures [were] strongly suggested by the history." The 1932 report also stated that there had occurred "five or six convulsions in past year, causing unconsciousness."

Later reports mentioned "epileptic deterioration" and "epilepsy petit mal." And then on October 10, 1935, the medical report showed "epilepsy grand and petit mal, with psychotic episodes, psychotic at this time." From then on, the medical reports consist largely of statements regarding "psychosis and epileptic deterioration." The assured as adjudged insane by the Circuit Court of the State of Oregon for the County of Multnomah and he was committed to the Oregon State Hospital for the Insane at Salem, Oregon, on March 9, 1934. Indeed, in its brief the appellant states that it "does not deny that the evidence would support a finding that he [Mahoney] was incompetent from March 1934."

The medical reports of 1934 and thereafter contain statements of case history given by the insured and his wife. This case history includes statements that after completing his vocational training in May, 1924, Mahoney engaged in occasional odd jobs of bookkeeping, but was not otherwise gainfully employed; that he had been unable to do work requiring any great amount of strength because of his back injury; that he had lived on his compensation, plus his wife's earnings, and had squandered what little money he had in "gambling and dancing;" that seizures started more than five years prior to the date of the examination (April 5, 1934), at first occurring only two or three times a year, but becoming more and more frequent during the past two years. The wife also reported that Mahoney's back bothered him a great deal, "although he had been fairly well physically," and during the last few years he became more irritable and quarrelsome, and commenced drinking to the point of becoming intoxicated. While intoxicated, he was especially quarrelsome and was abusive to his wife, to the point that she feared he would "do her bodily harm."

Another case history item recorded in April, 1934, is as follows: " * * * There has also been an increasing irritability and antagonism toward his family. He has become somewhat careless in his appearance and habits and while formerly he was more or less sociable, of late years he has been inclined to be seclusive, staying by himself, frequenting pool halls and gambling houses. At one time he thought that his wife was untrue to him and the history shows that his own morals are not above reproach. * * *"

The same report states that it was evident from the social history as given by Mrs. Mahoney that there has been some mental disturbance noted for at least the previous five years, and possibly longer.

The "summary" of the report of a neuropsychiatric examination, dated May 10,

712

1934, reads in part as follows: "It is quite evident from the history of this case that his difficulties started, possibly, during the war, when he received a severe injury to his back, which necessitated an Albee operation on the same. Since discharge from the army he has completed a course of vocational training in accountancy, but did not make any particular use of same in securing steady employment. The wife states that approximately ten or twelve years ago she noticed a decided change in his personality, that he was beginning to be irritable and fault finding. She states that he would wake up in the morning in a dazed condition. The wife said that the first seizure occurred approximately five or six years ago, but she thinks he must have had them before from the way he acted. At first the seizures were very infrequent, only three or four a year, but during the past two or three years they have become much more frequent. He has been more irritable prior to and following seizures and would be dazed for a considerable period of time following them. The history shows that the last seizure he had was just prior to his commitment to the Oregon State Hospital, Salem, Oregon, March 9, 1934, at which time he was picked up by the police, who stated he was wandering about in a dazed, confused manner. * *"

At the trial, Mrs. Mahoney testified that the insured had his first seizure in 1925 "or around in there," but that they were not frequent until after 1932. She said that he had seizures at the time of the trial, was older and was not so strong as in 1920, but that "outside of that he is the same, outside of having the seizures."

Dr. John C. Evans, superintendent of the Oregon State Hospital at Salem, examined Mahoney on March 10, 1934. Dr. Evans testified that at that time he found the insured to be suffering from "epileptic deterioration." In reply to a specific question whether Mahoney was sane or insane at the time of the examination, the psychiatrist said: "I would consider that he was insane, mentally sick."

Answering a hypothetical question, Dr. Evans expressed the opinion that the condition of the insured, as found in 1934, "was an end result of the head injury or injury to the central nervous system he received on November 11, 1918." The expert continued:

" * * * I would put it this way, that had that injury not occurred he would not have had his epilepsy, and I don't believe that any man is wise enough to say that even adopting the accident that took place, accepting that as a matter of fact, I don't believe anyone is wise enough to say just when the mental involvement did actually start. I am not wise enough to say that yesterday the man was well but today he is mentally sick * * *. Based upon my years of experience with head injuries and epilepsy it is my opinion that his impaired state of mind must have started perhaps within a few months following this head injury. That has been my experience, but I can't say whether it was the first two weeks or the first two months or a year, *but I believe it was during that period.* [Emphasis added]

*     *     *     *     *     *

"I believe he was deteriorated for some considerable period prior to the time I examined him, but whether or not he was frankly insane back in 1920 or along about that time I can't say for sure. I don't know; but I do believe he was deteriorated. I think his brain was injured, that is the idea, and that fine distinction—*I might add this, that if one had to choose between being frankly psychotic or to be deteriorated in mind the deterioration is much more harmful and much more permanent in character probably than some of the functional conditions known as being psychotic or insane.* [Emphasis added]

"Q. Is that a mental illness, being deteriorated? A. Yes, it is a type of mental illness, but it is not psychotic. That is a functional thing. *Some cases that are psychotic are curable, but when they are deteriorated they never get well * * *."* [Emphasis added]

Dr. Knox H. Finley, who for three years taught neurology and psychiatry at the Harvard Medical School, testified that he examined Mahoney shortly prior to the trial. Upon being asked an hypothetical question that included the findings made by him when he examined the insured, Dr. Finley testified that "in January, 1920, this man was at that time mentally ill, that is, the illness that he presented at the time I saw him was in existence at that time."

"Q. In your opinion would that individual be of an unsound mind at that time? A. Yes."

In the foregoing summary of the evidence, we have adopted much of the appellant's own abstract of the testimony, as printed in its brief. Even that abstract,

however, shows that the voluminous record discloses there was sufficient evidence to warrant the jury's finding that Mahoney was insane on or prior to July 3, 1931. Moreover, the District Court carefully instructed the jury on the question of insanity and no exceptions were taken to those instructions.

■ The jury need not believe that the veteran was a raving lunatic at the crucial date of July 3, 1931. Before that time he might well have held an office boy's job, working under close supervision, and still not have been able to protect his rights under the World War Veterans' Act.

■ The evidence as to Mahoney's mental malady, which we have summarized, likewise shows that the jury could well have concluded that on or prior to August 31, 1920, Mahoney was totally and permanently disabled. But there is in the record additional material on this latter point. In his opening statement, the appellant's counsel admitted "without any hesitation that Mr. Mahoney has a permanent disability and has had a permanent disability since the day of his discharge from the army;" and that "at no time of course could Mr. Mahoney do physical labor of any heavy degree." In his closing argument, counsel for the appellant said: "* * * Particularly I want to say to you that there isn't any question at all about this man's disability being severe, particularly at this time. He is no doubt permanently and totally disabled now. He no doubt has been for several years, perhaps since 1936. He had in the army a very severe back injury. * * *"

Taken in connection with Mrs. Mahoney's testimony that her husband's condition at the time of the trial was substantially the same as it was in 1920, except for the seizures and except for not being "as strong as he was," these admissions might reasonably have caused the jury to find that Mahoney was totally and permanently disabled at the earlier date.

■ Nor does the fact that Mahoney took vocational training in 1922 refute the assertion that he was totally and permanently disabled. The report of a neuropsychiatric examination of the insured made at the Veterans' Administration Facility at American Lake, Washington, on October 29, 1935, contains the statement that "he had vocational training in 1922 but was never able to take the proper advantage of this training." The jury might well have inferred that he was unable to take advantage of his training because of his physical and mental disabilities.

■ Copious citation of authorities is of little avail in war risk insurance cases, which are of a type that peculiarly requires decision on the special facts. As was observed in Hoisington v. United States, 2 Cir., 127 F.2d 476, 478: "* * * But recent decisions of the Supreme Court indicate very clearly that the issue of total permanent disability should be left for decision by the jury under proper instructions, rather than determined by the judges. [Cases cited.]"

■ Nevertheless, the symptoms disclosed by the insured in Halliday v. United States, 315 U.S. 94, 97, 98, 62 S.Ct. 438, 440, 86 L.Ed. 711, as set forth in the Supreme Court's opinion, are so closely similar to those of Mahoney, summarized above, that a quotation is permissible:

"Other witnesses, including his wife and brothers and neighbors, testified that when he returned from the war petitioner was 'suspicious of everybody,' 'didn't seem to be the same man,' 'seemed to be a man that didn't have a grip on himself,' 'didn't have the best control of himself.' They described him as 'a physical wreck,' 'nervous,' 'not right,' 'a complete physical and mental wreck, very badly torn up physically and mentally.' And one brother testified that petitioner's condition upon his return was 'practically the same as it is today.'

"*Period following October 31, 1920.* While it is true that total and permanent disability prior to the expiration of the insurance contract must be established, evidence as to petitioner's conduct and condition during the ensuing years is certainly relevant. It is a commonplace that one's state of mind is not always discernible in immediate events and appearances, and that its measurement must often await a slow unfolding. This difficulty of diagnosis and the essential charity of ordinary men may frequently combine to delay the frank recognition of a diseased mind. Moreover, the totality and particularly the permanence of the disability as of 1920 are susceptible of no better proof than that to be found in petitioner's personal history for the ensuing 15 years."

The references to the "difficulty of diagnosis" and "the frank recognition of a diseased mind" find an approximate echo in

714

Dr. Evans' difficulty in determining precisely when Mahoney became "frankly psychotic" or "frankly insane."

The appellant relies heavily upon Galloway v. United States, 9 Cir., 130 F.2d 467, decided by this court, and affirmed in 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458. But the "chasm of eight years" in the evidence in that case was stressed by the Supreme Court as being the "crux of the case," at pages 382-388 of the opinion in 319 U.S., at pages 1083, 1084 of 63 S.Ct., 87 L.Ed. 1458. As we have seen, there is no such "chasm" in the instant case, for the interval of time between the veteran's injury and the day of the trial has been bridged by the testimony of the man's relatives and fellow-workers, as well as by a long series of medical reports, most of them emanating from the appellant itself.

Accordingly, we hold that the action was not barred by the limitations provision, that the court below was correct in allowing the case to go to the jury, and that the judgment resting upon the jury's verdict should be affirmed.

Affirmed.