Francis H. Inge and James J. Duffy Jr. (of Inge & Twitty), Mobile, Ala., for plaintiff.

Ralph Kennamer, U. S. Atty., Thomas M. Haas, Asst. U. S. Atty., Mobile, Ala., for defendant.

THOMAS, District Judge.

This action was filed June 1, 1956, by Ruby Pearl Langley, seeking to recover the sum of $10,000, face amount of insurance under a National Service Life Insurance Certificate, effective April 1, 1944, upon the life of her brother, Paul W. Meece. The certificate was issued and took effect while the said Paul W. Meece, now deceased, was a soldier in the United States Army, in World War II. While the insurance otherwise would have lapsed for non-payment of premiums at the end of the grace period, midnight, November 1, 1945, it is the claim of the plaintiff that the policy matured by reason of Meece's total and permanent disability prior to its becoming lapsed.

**Ruby Pearl LANGLEY, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**Civ. A. No. 1649.**

United States District Court
S. D. Alabama, S. D.

Oct. 21, 1957.

As Amended Nov. 19, 1957.

Though a jury trial was demanded by the plaintiff at the time of filing suit, this subsequently was waived by agreement between counsel for the respective parties, and the case was tried to the court without a jury. The trial commenced September 12, 1957, was recessed to September 24, 1957, and upon conclusion of the trial on that day, the case was taken under submission by the court.

Written briefs have been filed by respective counsel for the parties and have been given due consideration by the court.

Based upon the amended stipulation of facts on file, the depositions taken and filed by the defendant, the exhibits and upon the testimony of the witnesses heard in open court on oral examination, the court makes the following:

Findings of Fact

1. The veteran, Paul W. Meece, served in the United States Army from October 12, 1938, to October 11, 1941; and immediately re-enlisted and served from October 13, 1941, to September 25, 1945, the date of his last discharge. While serving in the army, he applied for and there was issued a certificate of National Service Life Insurance, countersigned at Washington, D. C., August 29, 1944, showing the effective date of the insurance to have been April 1, 1944. The certificate bears No. N 16 830 875. The veteran's sister, at that time Ruby Pearl Rutledge, has since remarried, and under the name of Ruby Pearl Langley, is the plaintiff in this cause. The named beneficiary in the certificate was Ruby Pearl Rutledge. Paul W. Meece made payment of premiums monthly on the insurance, and through payment of premiums the policy remained in effect until November 1, 1945 (as stipulated by the government), at which time the policy would ordinarily have lapsed for non-payment of premiums, inasmuch as the above date constituted the end of the grace period. Plaintiff contends, however, that some time prior to October 1, 1945, Paul W. Meece, because of mental incapacity resulting from dementia praecox, schizophrenia, hebephrenic type, became unable to follow continuously any substantially gainful occupation and became, within the meaning of the policy "totally and permanently disabled"; that the policy or certificate matured by reason thereof prior to the time when it otherwise would have lapsed for non-payment of premiums.

2. It is admitted by the defendant that the plaintiff exhausted all of her administrative remedies prior to the time when this suit was filed, and that the action was commenced seasonably.

3. The defendant admits, likewise, that Meece, from May 3, 1946, was mentally incompetent and totally and permanently disabled until the date of his death May 30, 1954. It appears that as of May 3, 1946, this veteran was determined by the Veterans' Administration to be mentally incompetent and, as of that date, was granted total disability, the finding being that the veteran had service connection for his mental condition, which was diagnosed as dementia praecox, schizophrenia, hebephrenic type. He was granted a 100% disability rating; and a decision was rendered by the Veterans' Administration that he was totally disabled for insurance purposes on May 3, 1946. The defendant contends further, however, that prior to such date the veteran was not totally and permanently disabled, and in large measure bases its contention upon the fact that the veteran is shown to have worked continuously from October 1, 1945, through April 12, 1946; and that his service record in the army disclosed no physical or mental trouble, except hospitalization in 1939 for thirty days for "nervousness and weakness".

4. From and after May 3, 1946, this veteran was hospitalized from time to time in various Veterans' Administration hospitals, and was at all times admittedly mentally incompetent, suffering from the disease of schizophrenia, hebephrenic type, or, as sometimes reflected in the records of the Veterans' Administration, of "schizophrenic reaction, paranoid type, incompetent". On January 28,

1954, he was transferred to the Veterans' Administration Hospital at Nashville, Tennessee, following an examination revealing a marked degree of anemia. On February 19, 1954, he was transferred back to the Veterans' Administration Hospital at Murfreesboro, Tennessee, and thereafter was hospitalized until his death on May 30, 1954. The final diagnoses were: 1. Pulmonary edema. 2. Myocardial hypertrophy, and dilatation. 3. Anemia—severe. 4. Lymphatic leukemia. 5. Schizophrenic reaction—paranoid type, incompetent.

It appears unnecessary to recite in further detail the history of the veteran from and after May 3, 1946, to the date of his death, but the record thereof, in evidence in this case in the form of a stipulation, has been given due consideration by the court.

5. In addition to the original stipulation, there was filed an amendment thereto to the effect that service department records showed that no defects were noted when the veteran was examined at Camp Livingston, Louisiana, on October 8, 1941, for reenlistment purposes, and that he was found mentally and physically qualified for service in the army; that he later underwent a physical examination by an army physician on June 27, 1944, in connection with his application for National Service Life Insurance, and that the examiner's report showed "no deformity or departure from normal" except for an "occasional extrasystole"; that a physical examination made at Camp Shelby, Mississippi, on September 25, 1945, at the time of his second discharge from the army, showed that he met the physical and mental standards for discharge, and that he had no complaints except for "nervous condition, 1939, Panama, hospitalized, 30 days"; that he had no trouble as at September 25, 1945.

6. Five sisters of the decedent, including the plaintiff, and one brother and a cousin were present in person at the trial, and testified orally before the court in this case. The court had ample opportunity to observe these witnesses and form its conclusions as to their credibility and the accuracy of their testimony, and was favorably impressed with its sincerity, truthfulness and accuracy. Without attempting to detail the testimony of each, their testimony may be restated in substance as follows:

The veteran was born in 1914. Prior to his original enlistment in the United States Army in October 1938, he appeared to be in every respect normal physically and mentally, and up to that time no characteristics had developed to their observation which would indicate to the contrary. Before his enlistment he had worked at the Dupont Plant at Old Hickory, Tennessee, as a machine operator. Sometime after his original enlistment he was sent to the Panama Canal Zone and while there, in 1939, was hospitalized for "nervousness and weakness" for about thirty days. After being returned to the United States, he was demoted from sergeant in the army to private for refusing to call his detail out upon guard duty, insisting that it was being overburdened. He remained a private throughout the remainder of his army service. Some time during the year 1941, while visiting with his brother Ralph (who testified in open court), he told his brother of having seen a two-headed monster in Panama similar to that described in the Book of Revelations in the Bible, and talked illogically to his brother about the Bible. In August 1942, at Jasper, Alabama, where he went to attend the funeral of the plaintiff's first husband, he spoke to some of his sisters irrationally about things recorded in the Book of Revelations, particularly stressing the numbers seven and three, which he seemed to think had some great significance to him. At that time, he appeared to attempt to figure out all things about himself with respect to these numbers, and to prove his points through references to the Bible, none of which made any sense to his sisters. Again, he said that he had seen things come out of the sea and that he was the King of Kings and Leader of Men, and made other irrational statements. As far back as

August 1942, he told one sister that little men would come into his room at night, and go out through the keyhole, and that the last thing he would see would be a bloody heel. He was still having these same hallucinations shortly prior to his death in May 1954.

In June 1944, while on a visit to one of his sisters in Mobile, Alabama, he was observed to have become very quiet and withdrawn, associated with no one, and stayed in her home alone most of the time, sitting and staring. On this visit he continued his irrational talk with respect to the Bible. At times he would suddenly laugh out loud when, obviously, there was nothing to laugh at; and thereafter he could not explain to her his laughter. During this period he spoke of a seven-headed monster; he told his sister that her late husband was not the father of her small child and he, the veteran, had reasoned, through his study of the Bible, that he, himself, was the father. During this time, also, he was becoming uncleanly in his habits and refused to bathe, giving little attention to his personal appearance and cleanliness. He spoke of being the King of Kings and Leader of Men, and said that he would eventually rule. He was extremely forgetful and unable to remember simple requests made of him by his sister.

In midyear of 1944, when en route to the European Theatre of the war, he stopped in Maryland to visit a sister, Mrs. Ethel Hardy, who testified. She noticed on this visit that he was extremely forgetful and vague in his talk. He seemed then to be obsessed with making a great deal of money quickly, and spoke of this often. When he returned from the European Theatre in July 1945, having experienced combat service in the artillery, in the Battle of the Bulge, he again visited Mrs. Hardy in Maryland, being then en route to the Eastern Theatre, a destination prevented by the intervention of V. J. Day. His sister noted that his mentality had deteriorated greatly since she had last seen him. He argued with her that the earth was square and attempted to prove this by reference to the Bible. He continued to say that he was the King of Kings, the Grand Ruler and Leader of Men, and at this time complained of being persecuted, saying that President Roosevelt was fearful of him, and out to "get him" so as not to lose his leadership to Meece. There was testimony of much forgetfulness on this visit, of a tendency to sit and stare and laugh suddenly without reason.

Following the veteran's discharge from the army on September 25, 1945, and after his return to work for the Dupont Company of Old Hickory (this time, however, not as a machine operator, but in the lowest grade job the company provided, moving materials from one room to another and doing general clean up work), he made a visit to a cousin, Mrs. James Rochelle at Gallatin, Tennessee. This witness also testified in person, stating that she observed a great change in his appearance and in his strange talk, particularly in his tendency to be very quiet and then suddenly laugh out loud, without explanation as to why. She saw him on at least three other occasions prior to April 12, 1946, the date on which he left the Dupont job to go West. To her he appeared to act more strangely each time, and had become very slovenly in his appearance.

A sister living at Columbia, Tennessee, whom he visited on several occasions during the brief work period at the Dupont Company after his discharge from the army, likewise observed his habit of laughing suddenly after having been very quiet and without being able to explain his laughter. She testified that he had no friends or associates to her knowledge, and when visiting her home would sit and stare for the most part. When he talked at all, it was of going out West to make money quickly, which he seemed convinced he could do. He told this sister that people were following him and watching him.

The brother, Ralph Meece, testified as to having seen the veteran on a number of occasions during January 1946, while he was working at Dupont, and that Paul

seemed obsessed with making money quickly, stating that he could go out West and make money easily in the lumber business. This brother observed that Paul at that time was dirty and slovenly in appearance, and had an offensive body odor. On several occasions while they were sitting together in the yard, the veteran would suddenly draw his feet up and state, "Did you see that thing that ran across there?" The testimony by the sister and cousin and brother, who lived in Columbia, Tennessee, as to their observations set forth above, dealt with the interval of approximately six months, during which the veteran was working for the Dupont Company, following his discharge on September 25, 1945. As indicated, the testimony shows without dispute that he commenced working for Dupont in his second employment by this company on October 1, 1945, and continued to work without any loss of time until April 12, 1946, when he suddenly resigned and left to go West. It was on his arrival in Oregon shortly prior to May 3, 1946, and less than a month after he had left the Dupont Plant, that his condition, mentally, was found to be such that his sister took him to a Veterans' Hospital, where he was promptly diagnosed by the medical authorities there as being totally and permanently disabled by reason of dementia praecox and was rated service-connected 100% disability as of May 3, 1946.

7. The government contends that the veteran did not become totally and permanently incapacitated or disabled until May 3, 1946, when this diagnosis was made officially by the Veterans' Administration, and relies upon the facts that Meece had served creditably in the army without any medical history other than hospitalization for nervousness and weakness in 1939; and that following his discharge and commencing October 1, 1945, he had worked for a period of slightly more than six months for the Dupont Company without loss of time for illness.

8. The deposition of Ernest D. Burroughs, introduced by the defendant, established that he was engaged in personnel work at the Dupont Company, and was there during both periods of employment of Paul W. Meece. His testimony primarily dealt with the employment records of the company. He testified that he knew Paul Meece by sight and to speak to in passing, and also by record, which appeared to be satisfactory. It was obvious that he had no personal contact with the veteran. He stated that during the last employment period Meece was employed in one of the "lowest jobs". He thought perhaps there was another job that was just a little below it. In describing the character of work which Meece performed, he stated:

> "They supply the knitting machines with the necessary supplies to operate. They do utility work, clean up work, take out the waste and sometimes they think it is too much, really. Anything that the supervisor might direct is what they do. Of course, there are certain specific jobs that they do, such as supply the machines and general housekeeping."

The other witness from the Dupont Plant, whose deposition was taken by the government, and read in evidence, testified that he was employed by Dupont at Old Hickory during the period from October 1, 1945, through April 12, 1946, while Paul Meece was employed, and that he, the witness, was a supervisor. He stated that Paul Meece did not work directly under him, but was, in turn, under a foreman who reported to the witness; and that Meece, during the time, was an average worker. This witness did not know Meece when he worked for Dupont prior to his enlistment in the army, and had no means of making a comparison relative to the two employment periods. He did not recall ever having talked with Meece other than at the plant. He testified that Meece came in one morning and stated that he wanted to quit, and that he was going West to find employment; that it was an abrupt termination. The testimony of these two witnesses, whose depositions were taken, would ap-

pear to throw little light upon the mental condition of Meece, as they had little, if any, personal contact with him.

9. The plaintiff offered as a witness Dr. Ronald Mershon, of Mobile, Alabama. In qualifying as an expert in psychiatry, Dr. Mershon testified that he was educated at the University of Alabama and the University of Minnesota, from the latter of which he received his degree in medicine. He then interned, afterwards returning to Fairhope, Alabama, where he practiced general medicine for three years. Following this, he was with the United States Veterans' Administration for seven years in neuro-psychiatric work, having received his first training in psychiatry during these seven years. He then trained further in psychiatry and in general medicine at Henry Ford Hospital at Detroit for eighteen months. Later he was on the staff of Chrysler Hospital for five years as a consultant in neuro-psychiatry. Dr. Mershon testified that he had read and was familiar with the contents of the Stipulation of Facts and the amendment thereto, and that he had also read and was familiar with the depositions introduced by the defendant. Plaintiff then propounded to him a hypothetical question, which was based upon the assumption of the correctness of the amended stipulation and the depositions, and which summarized the other evidence in the case. Dr. Mershon had not known Paul W. Meece during his lifetime, and hence had never seen nor examined him. Based, however, upon the hypothetical question, he testified as an expert, that on the basis of the facts as submitted to him, in his opinion Paul W. Meece represented a "classic example" of schizophrenia, hebephrenic type, which is a particular classification of the mental disease more generally described as dementia praecox. He pointed out that the adjective "hebephrenic" simply means slowly progressing and developing, as contrasted with a mental disorder which shows a sudden onset. It would be extremely difficult, Dr. Mershon testified, to pinpoint any particular time at which Meece's mental disease had reached a stage which rendered him incompetent. However, he gave as his opinion that Paul W. Meece, prior to October 1, 1945, was in such mental condition that he would not thereafter in the future be able permanently to follow any gainful occupation; that the said Meece suffered from dementia praecox, schizophrenia, hebephrenic type, prior to October 1, 1945; that at some time before October 1, 1945, the disease had reached such state that the permanency of the malady and the inevitableness of the resulting total disability were reasonably predictable prior to that date. It was his opinion that Meece, prior to October 1, 1945, had suffered mental incapacity by reason of dementia praecox to the extent that he had become unable to follow continuously any gainful occupation in the future; and that such condition continued uninterruptedly until his death, notwithstanding the fact that Meece had worked in a low grade job for a period of a little more than six months after October 1, 1945.

10. The court finds that about the year 1941, Paul W. Meece began indicating signs of suffering from dementia praecox, schizophrenia, hebephrenic type, and that, in any event, in the year 1942, he was suffering from that disease and thereafter it gradually developed from its incipient stages to a condition of complete irresponsibility and helplessness which admittedly existed as of May 3, 1946, and thereafter.

11. The court further finds that at some time prior to October 1, 1945, and while his policy or certificate of insurance upon which this suit is founded, was in full force and effect, the veteran became totally and permanently disabled to the extent that he was unable, by reason of dementia praecox, schizophrenia, hebephrenic type, continuously thereafter to engage in any gainful occupation.

## Conclusions of Law

1. The court has jurisdiction of the subject matter of this controversy and of the parties.

2. In the case of Berry v. United States, 312 U.S. 450, 61 S.Ct. 637, 639, 85

L.Ed. 945, in submitting the case to the jury, the trial judge charged the jury as follows as to the meaning of "total and permanent disability":

"A total disability is any physical or nervous injury which makes it impossible for a person to follow continuously a substantially gainful occupation at any kind of work for which he was competent or qualified, physically and mentally, or for which he could qualify himself by a reasonable amount of study and training. The word 'total' as applied to 'disability' does not necessarily mean incapacitated to do any work at all. The word 'continuously' means with reasonable regularity. It does not preclude periods of disability which are ordinarily incident to activities of persons in generally sound health, for nearly all persons are at times temporarily incapacitated by injuries, or poor health, from carrying on their occupations. If Berry was able to follow a gainful occupation only spasmodically, with frequent interruptions, due to his injuries, and his shock, he was totally disabled. A disability is permanent when it is of such a nature that it is reasonably certain it will continue throughout a person's lifetime."

The Supreme Court of the United States, in reviewing this case, stated in its opinion:

"The trial judge, who had the same opportunity as the jury to hear the witnesses, denied the government's motion for a directed verdict and correctly instructed the jury what they must find from the evidence in order to return a verdict for petitioner."

Further in the opinion the court said:

"It was not necessary that petitioner be bedridden, wholly helpless, or that he should abandon every possible effort to work in order for the jury to find that he was totally and permanently disabled. It cannot be doubted that if the petitioner had refrained from trying to do any work at all, and the same evidence of physical impairment which appears in this record had been offered, a jury could have properly found him totally and permanently disabled. And the jury could have found that his efforts to work—all of which sooner or later resulted in failure—were made not because of his ability to work but because of his unwillingness to live a life of idleness, even though totally and permanently disabled within the meaning of his policies."

In a case decided in the United States District Court for the Western District of Kentucky, June 13, 1956, entitled Shelley v. United States, 142 F.Supp. 436, Chief Judge Shelbourne had before him a case quite like this one. In his conclusions of law, Judge Shelbourne carefully analyzed and quoted from certain cases which seem to this court to be controlling here. Among them are Berry v. United States, supra; Tieben v. United States, 7 Cir., 96 F.2d 907; Lumbra v. United States, 290 U.S. 551, 54 S.Ct. 272, 78 L.Ed. 492; Plocher v. United States, 6 Cir., 87 F.2d 860; Halliday v. United States, 315 U.S. 94, 62 S.Ct. 438, 86 L.Ed. 711; Knapp v. United States, 7 Cir., 110 F.2d 420; and others.

■ It seems clear from a consideration of the cases that the existence of a work record following the failure of a veteran to pay the premiums required under a policy is not necessarily decisive of the question presented for decision. Indeed, in a number of the cases cited above, the veteran had a much more extensive work record than the government showed Meece to have had. The question is whether or not the extent and character of the veteran's work record, to adopt the language of Plocher v. United States, supra [6 Cir., 87 F.2d 861], "completely refutes the evidence tending to show that he was totally and permanently disabled" before the date when his policy lapsed.

The court is of the opinion in this case that the evidence of the veteran's work record, when considered with all the other evidence, is not such as will refute

the evidence tending to show total and permanent disability.

Other language in the opinion in Plocher v. United States, supra [6 Cir., 87 F.2d 861], seems especially applicable to this case. There the court said:

"The veteran was suffering with a pronounced type of catatonic dementia praecox, a progressive and incurable mental disease. The permanency of the malady and the inevitableness of resulting total disability were reasonably predictable during the life of the policy and so caused it to mature."

Language also in the opinion in Halliday v. United States, supra [315 U.S. 94, 62 S.Ct. 441], seems to the court controlling in this case, viz.:

"While it is true that the total and permanent disability prior to the expiration of the insurance contract must be established, evidence as to petitioner's conduct and condition during the ensuing years is certainly relevant. It is a commonplace that one's state of mind is not always discernible in immediate events and appearances, and that its measurement must often await a slow unfolding. This difficulty of diagnosis and the essential charity of ordinary men may frequently combine to delay the frank recognition of a diseased mind. Moreover, the totality and particularly the permanence of the disability as of 1920 are susceptible of no better proof than that to be found in petitioner's personal history for the ensuing 15 years."

The totality and the permanence of the disability suffered by Meece prior to his effort to work, following his last discharge from the army, are susceptible of no better proof than that to be found in his history thereafter, including his mental condition shown to have existed throughout the time he was attempting to work, for the comparatively short period of six months or so.

The court, therefore, is reasonably satisfied from the evidence that Paul W. Meece was totally and permanently disabled from sometime prior to October 1, 1945, and continuously thereafter until his death; and that the plaintiff is entitled to recover of the defendant. A judgment in favor of the plaintiff and against the defendant for the proceeds of the policy will accordingly be entered.