**UNITED STATES of America,
Plaintiff,**

v.

**The PEELLE COMPANY et al.,
Defendants.**

**Civ. A. No. 15192.**

United States District Court
E. D. New York.

Jan. 20, 1956.

Leonard P. Moore, U. S. Atty., Brooklyn, N. Y., for plaintiff, Richard C. Packard, Brooklyn, N. Y., and Robert J. Grimmig, E. Rockaway, N. Y., of counsel.

John R. Bartels, New York City, for receiver.

Parker, Chapin & Flattau, New York City, for Henry E. Peelle, Jr., and Robert B. Peelle, Russell S. Knapp, New York City, of counsel.

ABRUZZO, District Judge.

## Part I

### Background of Case

This action is brought by the United States of America against the Peelle Company under Section 7403 of the Internal Revenue Code of 1954 to foreclose federal income tax liens assessed under Title 26, United States Code, § 3670 (now Section 6321 of the Internal Revenue Code of 1954). The complaint was filed in the Office of the Clerk of this Court on January 28, 1955. On that date a temporary Receiver of the Peelle Company was appointed pursuant to subdivision (d) of Section 7403 of the Internal Revenue Code of 1954. An order was subsequently made directing the temporary Receiver be made permanent. D.C., 131 F.Supp. 341. An appeal was taken to the Circuit Court of Appeals for the Second Circuit, 224 F.2d 667, and the order appointing the permanent Receiver was affirmed.

The Receiver has been operating the Peelle Company and, in spite of all the misgivings with respect to the damaging effect which a receiver might have on the business of this company (arguments strenuously advanced on the appeal), the various reports made to this Court from time to time indicate that the business has prospered, the morale of the employees is excellent and its financial position better than before the appointment of this Receiver.

The case was tried before this Court on various dates in June, September and October of this year. Final briefs reached the Court the latter part of November. It will be noted that there are various defendants but the only one properly served was the Peelle Company, the corporation, and, therefore, for the purpose of brevity it will be natural to refer to the United States of America as the plaintiff and the Peelle Company as the defendant.

The Receiver, after his appointment, requested that John R. Bartels, former Judge of the Supreme Court, Kings County, be appointed as his attorney. Such an order was made.

The Peelle Company was represented at the time of the beginning of the trial in June of this year by Blaisdell and Dunne. The firm of Parker, Chapin & Flattau represented the two main stockholders, Henry E. Peelle, Jr., and Robert B. Peelle, sons of Henry E. Peelle, Sr. These two controlled approximately 52 per cent of the stock of the corporation, and a brother of Henry E. Peelle, Sr., John W. Peelle, owned or controlled a minority stockholding of approximately 48 per cent. John W. Peelle was represented by the firm of Leve, Hecht, Hadfield & McAlpin. During the trial John W. Peelle discharged his attorney. He is not represented by an attorney at this time. The firm of Parker, Chapin & Flattau was substituted in the middle of the trial in place of Blaisdell and Dunne. The case on behalf of the defendant was

tried by Judge Bartels, and at the conclusion of the trial he submitted both a main brief and a reply brief. The firm of Parker, Chapin & Flattau which appeared for the two officers and main stockholders as aforesaid through Mr. Russell S. Knapp, of counsel, requested that Judge Bartels try the case on behalf of the Peelle Company, and Judge Bartels complied with that request. The firm of Leve, Hecht, Hadfield & McAlpin made a similar request. Judge Bartels was assisted by Mr. Knapp and Mr. William D. Dunne of Blaisdell and Dunne.

The amounts of the liens and the years involved are as follows:

| Year | Nature of Tax | Amount including fraud penalty |
|------|---------------|-------------------------------|
| 1945 | Income and excess profits ................. | $ 227,533.55 |
| 1947 | Income ................................. | 173,736.78 |
| 1948 | Income ................................. | 377,040.34 |
| 1949 | Income ................................. | 351,795.87 |
| | Total Assessment and Liens | $1,130,106.54 |

The Peelle Company is a New York corporation, engaged in the manufacture of fireproof doors and the sale thereof and the manufacture of moving stairs and the sale thereof. The defendant has a subsidiary, the Richmond Fireproof Door Company, Richmond, Indiana, acquired in 1919, and the Receiver has been in complete control of this subsidiary.

From 1945 to 1949, the officers according to the minute book of the defendant (Govt. Ex. 35) were as follows:

Henry E. Peelle.......... President & General Manager
Arthur A. Allen.......... Vice President & General Superintendent
James F. Peelle.......... Vice President
Paul R. Saurer.......... Vice President (1946 to 1949)
Robert B. Peelle.......... Vice President (1946 to 1949)
John W. Peelle.......... Secretary & Treasurer
Margaret F. Smith....... Assistant Secretary
Henry E. Peelle, Jr....... Assistant Treasurer (1948–1949)

When the trial of the issues commenced it was very apparent that it would be a difficult task requiring many court days to try the issue of the increase in taxable net income for the years 1945, 1947, 1948 and 1949. A great number of items were in dispute. At the Court's suggestion both the plaintiff and the defendant agreed that the accountants for both the plaintiff and the defendant would explore the figures with a view to making some stipulation which would avoid the tedious task of going into each and every item for these taxable years. Pursuant to that request a stipulation was eventually entered into by both the plaintiff and the defendant (Govt. Ex. 29(b)). It was stipulated that there were to be increases in taxable net income for the four years in question as follows:

| Year | Amount of Increase in Taxable Net Income |
|------|------------------------------------------|
| 1945 | ................. $ 103,056.14 |
| 1947 | ................. 227,310.08 |
| 1948 | ................. 480,135.36 |
| 1949 | ................. 473,438.71 |
| Total | $1,283,940.29 |

Many of these conferences were held before the Court, and a great many of the debatable items were weighed and yielded by the plaintiff which resulted in the eventual stipulation (Govt. Ex. 29 (b) ). Both sides are to be commended

for the spirit of give and take and helpfulness in arriving at these figures. There is no doubt that the statute of limitations has run against the assessment of any tax for these taxable years and, unless the plaintiff is able to prove fraud in the income tax returns for the years 1945, 1947, 1948 and 1949, plaintiff must be non-suited. The plaintiff concedes this. The plaintiff further concedes that the burden of proving fraud is upon it.

The defendant filed federal income tax returns for the years 1945, 1946, 1947, 1948 and 1949 in Brooklyn, New York (Govt. Exs. 5, 6, 7, 8 and 9). The returns for each of these five years were made on an accrual basis. The net taxable income reported by the defendant and the tax reported due for each of these years 1945–1949 pursuant to these income tax returns are as follows:

| Year | Net Taxable Income Reported | Income Tax Reported Due |
|---|---|---|
| 1945 | $ 613.73 | $ 153.43 |
| 1946* | (− 114,799.66) | -0- |
| 1947 | (− 9,755.55) | -0- |
| 1948 | 222,026.45 | 84,370.05 |
| 1949 | 14,988.15 | 3,347.27 |

\* The income tax return for the year 1946 is not involved in this litigation.

The 1945, 1946 and 1947 returns were signed by Henry E. Peelle, as president, and John W. Peelle, his brother, as treasurer; 1948 and 1949 by Henry E. Peelle, as president, and Henry E. Peelle, Jr., his son, as assistant treasurer.

## Part II

### Plaintiff's Claims

The plaintiff sets forth six categories of fraud as follows:

1. Unreported receipt of income
2. Unidentified deposits in bank accounts showing inactive balances on the company's books
3. Personal expenses of officers charged to company expense

- 4. Fictitious expenditures
5. Devaluation of inventory
6. Investment improperly charged to expense

These six categories contain the items of extra income which resulted in the stipulation (Govt. Ex. 29). There are upwards of 1,200 pages of testimony. Of necessity, therefore, only a few of these items can be reviewed.

## Part III

### Defendant's Claims

The defendant claims there was no fraud. Its defense might be summarized as follows:

1. None of the officers knew what Henry E. Peelle, Sr., was doing.
2. Henry E. Peelle, Sr., was incompetent.
3. Henry E. Peelle, Sr., was guilty of embezzlement.
4. None of the co-officers of Henry E. Peelle, Sr., was negligent.
5. Even if they were negligent this is not fraud, for as a basis of fraud there must be an intent.

## Part IV

### Plaintiff's Evidence

The defendant maintained four checking accounts in the Bank of the Manhattan Company, divided as follows: a general fund account, a special account, a payroll account, and an account for employees' taxes. These deposits admittedly were recorded on the company books. Three other bank accounts were maintained by the defendant: at Boulevard Bank (known after May, 1948, as the Sterling National Bank & Trust Company); at Pennsylvania Exchange Bank; and at Corn Exchange Bank Trust Company. The Boulevard Bank account was opened pursuant to a resolution of the defendant company dated November 12, 1929. Prior to May, 1948, Henry E. Peelle, Sr., was a director of Boulevard Bank. In September, 1948, the defendant by a resolution of the board of directors authorized the opening of an account

and the deposit of moneys in the Pennsylvania Exchange Bank. On October 7, 1948, a like resolution was passed by the board of directors designating the Corn Exchange Bank Trust Company a depository. The resolution with respect to all of these accounts directed that checks were to be signed by two or more officers of the defendant corporation.

Throughout the prosecution period there were substantial company deposits made in these three banks which were not truly reflected on the books of the defendant. These three last accounts, while in the defendant company name, were controlled by Henry E. Peelle, Sr., as president and chief executive officer, and Margaret F. Smith, assistant secretary, chief accountant and head of the bookkeeping department. Miss Smith had a desk just outside the office of Henry E. Peelle, Sr. It appears that the manner of making these deposits in these three banks followed a definite pattern. Each morning all of the checks constituting the morning's receipts of the defendant were received by Miss Smith at her desk. Miss Smith prepared a statement setting forth the bank balance at the close of the previous day, the amount of receipts, the anticipated payments and the anticipated bank balance at the end of the day. This statement and checks which had come in were then handed to Henry E. Peelle, Sr. Some of these checks were returned to Miss Smith who gave them to her assistants to be entered on the books and deposited in the Bank of the Manhattan Company. Some of them were not deposited in the Bank of the Manhattan Company but were deposited in one of the other three banks. For the prosecution years involved it appears from the evidence that some three-quarters of a million dollars were deposited in the three banks, to wit, Boulevard, Pennsylvania Exchange and Corn Exchange.

The defendant owned a factory building which a tenant by the name of Hilo Varnish Corporation occupied. This tenant paid the defendant $30,000 rental per year, payable monthly. Miss Smith testified that Henry E. Peelle, Sr., usually retained the Hilo rent check when it was received and deposited it in either the Boulevard, Pennsylvania Exchange or Corn Exchange banks. None of the Hilo checks so deposited in the latter three banks was ever included in the defendant's income tax returns. Some of the Hilo checks were not retained by Henry E. Peelle, Sr., but were recorded in the cash receipts book and general ledger of the company. Of the sixty Hilo rent checks received, $110,000 was deposited in the three so-called outside banks and not included in the tax returns, and sixteen checks totaling $40,000 were deposited in the Bank of Manhattan Company. Thirteen other sources constituting income to the defendant during the prosecution period were deposited in the three outside banks. Some of these deposits were made by Peelle, Sr., directly, and some by Miss Smith. These items included rental, commission and interest income from a subsidiary, the Richmond Fireproof Door Company, royalty income from Otis-Fensom, Ltd., Westinghouse Electric Corporation and Security Fire Door Company; proceeds of sales of Peelle Company products to Otis Elevator Company and Yunker Metals Products Company; proceeds of sales of scrap steel to Bethlehem Steel Corporation; interest on bonds, dividends on stocks; and insurance refunds. The thirteen sources alluded to constituted a category which is shown by the following table:

| Year | | Amount |
|------|---|--------|
| 1945 | ................. | $ 97,614.81 |
| 1946* | ................. | 63,860.31 |
| 1947 | ................. | 46,988.62 |
| 1948 | ................. | 110,725.10 |
| 1949 | ................. | 122,659.50 |
| | Total | $441,848.34 |

* 1946 taxes are not involved.

These items were not included in the income tax returns. There were other sources of income which could not be identified. The deposits were made in

these three outside banks. These deposits were made as follows:

| Year | Amount |
|------|--------|
| 1945 | $ 7,879.28 |
| 1946 | 6,047.38 |
| 1947 | 12,934.41 |
| 1948 | 22,372.81 |
| 1949 | 4,545.55 |
| Total | $53,779.43 |

The principal officers of the defendant company paid their personal expenses for such items as refrigerators, automobiles, landscape gardening services, venetian blinds, hot water heaters, carpeting, house paint, insurance premiums and payments of personal income taxes which were charged off to company expense and taken as deductions on the company's income tax returns during the prosecution period. The officers whose personal expenses were paid by the defendant are as follows:

Henry E. Peelle, President

Paul R. Saurer, Vice President

Arthur A. Allen, Vice President

Robert B. Peelle, Vice President

John W. Peelle, Secretary-Treasurer

The personal expenses of Henry E. Peelle, Sr., included moneys spent for private homes at Ocean Grove, New Jersey; Rochester, New York; Miami Beach, Florida; and Manhasset, Long Island; and also the home of a son-in-law, Robert E. Rath, at Morristown, New Jersey.

In 1949, the income taxes of Henry E. Peelle, Sr., in the sum of $5,500 were paid by the defendant and charged to expenses. It is difficult to enumerate the amounts expended for each of these benefits to Peelle, Sr. It might be well to allude to and highlight some of the important expenditures. It appears that the Croton Hotel, Miami Beach, Florida, was purchased on January 15, 1947, in the name of Henry Peelle and Margaret W. Peelle (wife of John W. Peelle who was secretary-treasurer of the defendant company). Henry E. Peelle, Sr., and John W. Peelle were brothers. The purchase price of this hotel was $200,000 and it was bought subject to three mortgages aggregating $70,000. The balance was paid in equal shares by Henry E. Peelle, Sr., and John W. and Margaret W. Peelle, his wife, out of their respective personal funds. During the period from January 15, 1947, to December 31, 1949, mortgage payments on the hotel in addition to payments of all the premiums due on the fire insurance policies were paid by the defendant, charged to the expense account on the company's books and taken as deductions on its income tax returns. These expenses for the three years, 1947, 1948 and 1949, amounted to $21,257.62. Many of the expenses for his other homes were similarly paid.

Paul R. Saurer was elected vice president of the company in 1946 and during this prosecution period he was known as sales manager of the company. His salary varied from $7,020 a year in 1946, a loss year, to $15,000 in 1949. In addition to his salary he was allowed to draw $800 per month for expenses and it was understood that he was to give no accounting to the company for this money. Some of his personal expenses were paid by the defendant, for instance, automobile insurance premiums, farm supplies, and personal income taxes, all charged to expense on the company books and taken by the defendant as income tax deductions on its returns. He did not know, nor did he ever ascertain, how these items had been charged on the company books, but he did know they were not deducted from his salary. He testified that in 1950 he received a bonus of approximately $6,000 which wiped out all that he had owed the company for personal expenses. There appeared to be some confusion in his testimony as to whether he obtained the $6,000 to pay a deficiency assessment made against his taxes in 1950 or whether the company had first given him this money as a loan.

Arthur A. Allen was vice president and general superintendent in charge of production during the prosecution period. In addition to his salary he was given

approximately $400 per month as an expense account for which he accounted only irregularly and verbally. Some of his personal expenses were paid by company checks and he personally authorized their payment. The expenses so paid included insurance premiums, a gas range, a hot water heater, and a kitchen sink. They were charged as expenses on the company books and taken as deductions on its income tax returns. Allen testified that he did not report these expenses as income in his own personal tax return, did not repay the company, and considered them as additional salary. He testified that what was done for him was done with all the officers.

Robert B. Peelle, a son of Henry E. Peelle, Sr., was elected vice president of the company in 1947. In addition to his salary some of his personal expenses were paid. They included tuition for one of his children, landscape gardening services, fertilizer, and grass seed. These expenses were not deducted from his salary or charged to him. He authorized these payments as an officer of the company. In many instances he authorized the payment of personal expenses of Henry E. Peelle, Sr., his father. These items included house paint, light bills, water bills and plumbing bills.

Henry E. Peelle, Jr., a brother of Robert B. Peelle and a son of Henry E. Peelle, Sr., was assistant treasurer of the Peelle Company in 1948 and 1949. In that capacity he signed checks constituting payment for officers' personal expenses.

John W. Peelle, a brother of Henry E. Peelle, Sr., was secretary-treasurer of the company and during the prosecution period received a salary totaling $49,500. He testified that he came to the company once or twice a year. He was also a stockholder and controlled through his own stockholdings and others close to him 48 per cent of the stock of the defendant. He was convicted in this Court as a tax evader. He testified that he did not know whether any non-corporate expenses had ever been charged on the books of the defendant as corporate expenses.

He is the John W. Peelle who was part-owner of the Croton Hotel upon which hotel $21,000 of expenses were paid out of the corporate funds during 1947, 1948 and 1949. In 1948 John W. Peelle caused the defendant company to enter into a contract signed by him as treasurer with Warsaw Elevator Company, Warsaw, New York, whereby Warsaw installed an elevator in a personal building of John W. Peelle in Watkins Glen, New York, at a cost to defendant of $7,203. This debt was offset by the defendant against an account receivable from Warsaw Elevator Company and was never paid to the defendant by John W. Peelle or charged to him. The defendant did not include this item in its tax return, thereby receiving a tax benefit. John W. Peelle testified that although his signature appeared on some of the minute books he did not remember signing any corporate minutes. He did concede that his signature did appear on certain other books and papers, to wit, a notice of meeting of stockholders, minutes of directors' meeting, and copies of three documents relating to an amendment of the certificate of incorporation of the defendant company.

Fictitious expenditures were charged. It appeared that in the latter part of 1948 the company was making considerable profit and that Henry E. Peelle, Sr., and Miss Smith would have to discover a way of taking cash out of the regular account which would not be reported as profit because of the tax cost. At the end of each month the amount of cash available would be determined. A fictitious list of expenses with no basis in fact would be drawn containing fictitious names and amounts. The names and amounts would be entered on the books and a check drawn for them. These checks and lists of fictitious expenses were destroyed by Miss Smith and a check equal to the aggregate amount of the destroyed checks would be drawn and deposited in the outside bank accounts.

Ninety-three checks during the years 1948 and 1949 were thus drawn and they were charged off on the books as contract material, miscellaneous purchase material, factory overhead, legal expense, and administrative expense. They would in turn be taken as tax deductions on defendant's income tax returns. None of these checks so deposited was reflected on the balance sheet submitted by the defendant on either the 1948 or 1949 income tax returns.

There was a devaluation of inventory in 1948 and 1949. Henry E. Peelle, Sr., and Miss Smith, assistant secretary, were the officers who made this devaluation. At the close of 1948 and 1949 the inventory was arbitrarily reduced on the books by approximately $200,000 for the two-year period. This reduction in the closing inventory of the books of the defendant had the effect of reducing by that amount the cost of sales and gross profits as reported on the income tax return. A sizable tax was therefore saved. The defendant was the only beneficiary of the saving in taxes by virtue of this devaluation. The manner in which it was done was as follows:

Near the end of the year 1948 the inventory as shown on the books of the defendant amounted to $342,073.40. The actual value was in fact $333,165.33. The accounting department was instructed to make entries in the books reducing the book value of the closing inventory to the false figure of $166,582.67, instead of the true figure of twice that sum. It, therefore, had the effect of understating the profit for the year in the amount so reduced.

In 1949 the same procedure was followed except the amount involved was $32,460.25. There was no attempt to hide these figures in the books. An examination of the books would have shown these two devaluations in 1948 and 1949.

In 1949 the defendant made an investment of $130,000 in the capital stock and inventory of a newly acquired subsidiary, Multiscope, Inc. One thousand shares of Multiscope, Inc., were bought, being all of the outstanding shares, at a price of $568 per share, payable in installments to the Condon National Bank, Coffeyville, Kansas, an escrow agent, with an immediate down payment of $115,000. It was the purpose of the defendant in purchasing this stock to manufacture moving stairs. Defendant acquired certain patent rights and the method of making moving stairways. It was intended to increase the number of products made by the defendant and lead to greater profits. At first this investment was entered on the books as investment of capital, thereby making it a non-deductible item for income tax purposes. Subsequently, pursuant to instructions from Henry E. Peelle, Sr., this payment of $115,000 was charged to contract expense. Multiscope, Inc., had an inventory of $15,870. This sum was added to the down payment of $115,000 and both charged off on the books of the defendant as contract material and taken as a deduction on the income tax return for 1949.

## Part V

### Defendant's Answer to this Evidence

The defendant does not seriously dispute a great portion of the proof offered by the plaintiff under Part IV.

1. They offered evidence that none of the officers knew anything whatever of the three outside bank accounts or so-called "secret" bank accounts.

2. They were not familiar with the books or records of the corporation, nor with the bookkeeping practices of the company during the said period.

3. They did not know to what accounts disbursements made by the company, including their own personal expenses, were charged.

4. They did not know whether any non-corporate expenses were charged on the books of the company as corporate expenses.

5. They did not prepare, nor had anything to do with the preparation of the income tax returns for the years 1945 to 1949, inclusive, or that they were in any way inaccurate or false.

The defendant sets forth two affirmative defenses:

6. Incompetency of Henry E. Peelle, Sr.

7. Embezzlement by Henry E. Peelle, Sr.

The Court is not in the slightest convinced by the proof offered by the defendant that the officers were not familiar with the books or records of the company. Their activities indicate otherwise. The general proof is to the effect that all of the officers of the company during the prosecution period presented personal vouchers for payment by the defendant and were fully cognizant of the fact that these expenses were paid out of corporate funds and not repaid by them. The corporate defendant at some time either charged these personal items off as company expenses or loans, bonuses or raises in salary. Nevertheless, the one salient fact which the proof pointedly suggests is that these personal expenses were improperly charged to the company, were not repaid and were taken by the defendant company as tax exemptions. The bald testimony of these officers blandly testifying that they knew nothing whatever of the books or records is not borne out in the slightest by the chain of transactions so alluded to. They were receiving large salaries, they were well educated, and the Court cannot conceive of men of their standing not realizing the duties and obligations concerned with the holding of office in a corporate structure. Each and every officer, in view of the acts set out under Part IV strongly suggests they owed a duty to inspect the books. They were there— the proof is that they were available at all times.

The officers knew income tax returns had to be made. At least one other officer besides Peelle, Sr., signed each of the income tax returns in question.

These officers testified that they did not attend any meetings. The minutes show they did. John W. Peelle, as an officer, certified to the correctness of some of these minutes. He did not re-member signing any. The Court believes these officers attended the meetings.

The officers further testified that they did not know what disbursements were made by the company or to what accounts they were charged. This is in respect to the fictitious expenditures appearing on the books.

They knew their own personal expenses were improperly charged. Nothing was done by them to correct that improper practice. As each and every officer knew that his own personal expenses were being charged off improperly, this in itself should have put them on their guard to inspect the books and records of the company and fulfil, at least in an elementary manner, their duties and obligations as officers.

As to the three outside bank accounts, John W. Peelle at least knew that they were in existence. He signed one check on one of these accounts. The minutes of the board of directors' meetings contain resolutions which directed the opening of these so-called outside accounts. Miss Smith who was an assistant secretary knew of these outside accounts. A cursory examination of the books by any of the officers throughout this prosecution period would have indicated a shortage in company assets. These officers testified that they did not assist, or help, or know what was in the tax returns. Each and every tax return was signed by Henry E. Peelle, Sr., and one other officer, and prepared by Miss Smith, the assistant secretary. The officer who co-signed with Peelle, Sr., certified to the correctness of the income tax returns. The other officers, it seems to the Court, owed a duty and obligation to know what the income tax returns contained or, at least, they could have found out by asking Miss Smith or any of the employees in the accounting department.

There is not one scintilla of evidence by any of these officers that they made any effort to acquaint themselves with any of the fictitious expenditures, the correctness of the tax returns, or what the assets and liabilities of the defendant were at any time during the prosecution peri-

od. It is difficult to accept this testimony as true. It is noteworthy in reaching this conclusion that the fraud charged to the defendant covered a long list of transactions, each of which was fraudulent, over a long period of time, to wit, four years. The fraud so perpetrated was not the result of the acts of Peelle, Sr., alone, but each and every officer serving with Peelle, Sr., during this four-year period committed either one or several acts of fraud in each year of the four taxable years.

### Part VI

*Law as to Fraud*

█ The period of limitations applicable to a taxpayer's civil liability is three years, Title 26, United States Code, § 275(a) (now Sec. 6501(a), Internal Revenue Code of 1954). There is no period of limitations, however, which applies to civil tax liability in the case of a false and fraudulent return prepared and filed with the intent to evade tax, 26 U.S.C. § 276(a) (now Sec. 6501(c) of the Internal Revenue Code of 1954).

█ In the case of fraud, moreover, if any part of the deficiency is due to the fraud of the taxpayer with intent to evade tax, a fraud penalty amounting to fifty per cent of the entire deficiency is assessed, 26 U.S.C. § 293(b) (now Sec. 6653(b) of the Internal Revenue Code of 1954).

In Currier v. United States, 1 Cir., 166 F.2d 346, the president and stockholder of a corporate defendant deposited in his personal account numerous checks representing proceeds of a sale of goods by the corporation. These checks were not recorded in the corporation's books or on its income tax return. The defense contended that the acts of the president were against the interest of the corporation and his fraud should not therefore be imputed to the corporation. It was held that there was fraud on the part of the president, and the defense of non-imputation to the corporation because of his personal acts was rejected. It is to be noted that the Currier case was a criminal case where the rules of evidence and requirements are more stringent than the case at bar. The Currier decision has been cited and followed by the Tax Court in civil tax fraud cases. Auerbach Shoe Co., 1953, 21 T.C. 191, 194; Ace Tool & Eng., Inc., 1954, 22 T.C. 833, 842. In the Auerbach case the president of the corporation knowingly concealed sales and retained the proceeds for himself. These sales were not recorded on company books and in turn the tax returns were not true and correct. The Tax Court found fraud.

In Joseph Calafato, 1940, 42 B.T.A. 881, it was held at page 891:

"The fact that large unexplained amounts passed through petitioners' accounts during the taxable years is substantial evidence to be considered in determining the question of fraud."

In Bennett E. Meyers, 1953, 21 T.C. 331, 348, personal expenses were charged to the corporation. Kickbacks were required of the employees. This was held to be fraud.

The making of false entries or alteration in a taxpayer's records such as the devaluation of the defendant's inventory were cited in Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418, as illustrative of a method to wilfully defeat and evade the income tax. This was aptly condemned in the Spies case by the United States Supreme Court.

Griffiths v. Commissioner, 7 Cir., 50 F.2d 782, cited by the defendant, is distinguishable in that the officer charged with the fraud was very old and ill, did not prepare the income tax return himself, and there was no direct evidence of concealment on his part. He was negligent in relying upon his bookkeeper.

In Wiseley v. Commissioner, 6 Cir., 185 F.2d 263, the petitioner was a physician during the war years and was burdened with more work than he could do. The Tax Court assessed fraud penalties during these particular years, 1942 to 1945, inclusive. There was little if any evidence of intentional wrongdoing. As a matter of fact, Wiseley made an amend-

ed return for 1943, 1944 and 1945 and overpaid his taxes. That case is readily distinguishable.

Halliday v. United States, 315 U.S. 94, 62 S.Ct. 438, 86 L.Ed. 711, is a War Risk Insurance policy case, the relevancy of which on the question of fraud the Court cannot see.

Crowther v. Crowther, 1 All.Eng.Rep. (1951) 1131, is not in point.

Duffin v. Lucas, 6 Cir., 55 F.2d 786, relates to a tax transaction and whether or not it was "income."

 The defendant's contention that fraud cannot be lightly inferred but must be established by clear and convincing proof is a point well taken. The Court has no quarrel with that particular conclusion on the part of the defendant. Fraud with respect to the many transactions cited under Part IV of this opinion was proven as against all of the items contained therein. All of the officers during each and every year of the prosecution period took some part in the fraud charged by the plaintiff. The burden of proving fraud, cast upon the plaintiff, has been amply sustained.

## Part VII

### Findings of Fact as to Fraud

1. That the Boulevard Bank account, the Pennsylvania Exchange Bank account and the Corn Exchange Bank Trust Company account were all opened pursuant to resolutions of the defendant corporation, and that substantial deposits were made in these three accounts controlled by Henry E. Peelle, Sr., as president and chief executive officer, and Margaret F. Smith, assistant secretary, chief accountant and head of the bookkeeping department.

2. That from 1945 to 1949, inclusive, the following moneys found their way into these three outside bank accounts: 1945, $126,768.99; 1946, $71,223.03; 1947, $60,923.03; 1948, $196,864.88; and 1949, $222,681.29, totaling $678,461.-22.

3. That there were many other sources of income to the defendant through-out the prosecution period deposited in these banks which were not reported in the income tax returns.

4. That the rental paid by the Hilo Varnish Corporation as a tenant of a factory building owned by defendant to the extent of $110,000 through the period in question in this suit was deposited in these three outside banks and not reported in the income tax returns of the defendant.

5. That some of the moneys so deposited in these three outside bank accounts included rental, commission and interest from the defendant's subsidiary, the Richmond Fireproof Door Company, royalty income from Otis-Fensom, Ltd., Westinghouse Electric Corporation and Security Fire Door Company, proceeds of sales of Peelle Company products to Otis Elevator Company and Yunker Metals Products Company, interest on bonds, and dividends on stocks and insurance funds which were not included in the income tax returns.

6. That the deposits set forth in findings numbered 1, 2, 3, 4 and 5 were made in order that the true income of the defendant could not be ascertained, this constituting fraud.

7. That the principal officers of the company, Henry E. Peelle, Sr., Paul R. Saurer, Arthur A. Allen, Robert B. Peelle, and John W. Peelle, paid various personal expenses itemized as refrigerators, automobiles, landscape gardening services, venetian blinds, hot water heater, carpeting, house paint, insurance premiums and payments of personal income taxes, these items being charged off as company expenses and taken as deductions on the defendant's income tax returns during the prosecution period, and, further, that these deductions were not properly chargeable to company expenses and should not have been taken as deductions on the defendant's tax returns.

8. That the personal expenses of Henry E. Peelle, Sr., which included moneys spent for private homes at Ocean Grove, New Jersey; Rochester, New York; Miami Beach, Florida; and Manhasset, Long Island, were improperly taken as

deductions by the defendant on its income tax returns, and included in this finding are the expenses paid for the home of Robert E. Rath, son-in-law of Henry E. Peelle, Sr., at Morristown, New Jersey, which were also charged as company expenses and improperly taken as a tax deduction.

9. That in 1949 the personal income taxes of Henry E. Peelle, Sr., were paid by the defendant, charged to expenses, and that many other amounts were so expended for the benefit of Henry E. Peelle, Sr., and paid by the defendant and charged to company expenses.

10. That expenditures for the Croton Hotel, Miami Beach, Florida, for the account of Henry E. Peelle, Sr., were paid by the defendant and improperly charged to expenses.

11. That the defendant paid the personal expenses on the Croton Hotel for the account of Margaret W. Peelle, wife of John W. Peelle, secretary-treasurer of the defendant company, and improperly charged them to company expenses.

12. That during the tax period in question personal expenses of Paul R. Saurer, vice president of the company, were paid by the defendant and improperly charged to company expenses.

13. That the defendant paid personal expenses of Arthur A. Allen, vice president and general superintendent in charge of production, during the period in question and improperly charged them to company expenses.

14. That during the tax period in question personal expenses of Robert B. Peelle, vice president and son of Henry E. Peelle, Sr., were paid by the defendant and improperly charged to company expenses.

15. That the defendant paid personal expenses of Henry E. Peelle, Jr., son of Henry E. Peelle, Sr., during the period in question and improperly charged them to company expenses.

16. That in 1948 John W. Peelle, an officer of the defendant, was instrumental in installing an elevator in a building owned by him in Watkins Glen, New York, at a cost of $7,203 which was a personal debt of this officer. This item was paid by canceling an account receivable from the Warsaw Elevator Company owed to the defendant, thereby improperly charging the defendant company with this expense and improperly taking it as a tax deduction.

17. That many fictitious expenditures were charged which are set out in detail under Part IV of this opinion. The Court finds further that the amount of these fictitious expenditures was substantial.

18. That there was a devaluation of inventory in 1948 and 1949 of approximately $200,000 during these two years, this devaluation being improper and entered on the books for the sole purpose of reducing the tax due and owing to the plaintiff.

19. That in 1949 the defendant made an investment of some $130,000 in the capital stock and inventory of Multiscope, Inc. The manner in which this investment was made appears in Part IV of this opinion. The Court finds further that this investment was charged off on the books of the defendant as contract material and improperly taken as a deduction in the income tax return for the year 1949.

20. That pursuant to stipulation the defendant is charged with the following increase in taxable net income: 1945, $103,056.14; 1947, $227,310.08; 1948, $480,145.36; and 1949, $473,438.71.

21. That pursuant to this table so stipulated there must be added a fraud penalty of 50 per cent and interest to the date of the appointment of the Receiver, to wit, January 28, 1955.

22. That for each of the tax years in question not only Henry E. Peelle, Sr., committed an act of fraud, but other officers did likewise.

### Part VIII

*Incompetency—Defendant's
Affirmative Defense*

This defense must be approached in analysis in two directions:

1. Was Henry E. Peelle, Sr., incompetent during the prosecution period; and

2. Assuming that he was incompetent, would that be a total defense?

Each of these two prongs is important.

The defendant produced five qualified psychiatrists, Dr. George Harold Gerow, Dr. Francis J. Hamilton, Dr. Lawrence S. Kaplan, Dr. James H. Wall and Dr. Paul S. Jarrett.

Dr. Gerow was in charge of the Westport Sanitarium in Connecticut and first examined Henry E. Peelle, Sr., at that Sanitarium on August 21, 1950. He made a complete and thorough examination and found him suffering from cerebral arteriosclerosis. He obtained Mr. Peelle's history from Inez Peelle, the wife, and Robert B. Peelle, the son. Inez Peelle did not testify and Robert B. Peelle, while he testified, gave very little evidence as to his father's history prior to the August examination by Dr. Gerow. Based upon the findings from the physical and mental examinations and the history of the patient, Dr. Gerow testified that he was of the opinion that Peelle, Sr., was incompetent in August, 1950. He made several examinations after August, 1950. He was of the opinion that Peelle, Sr., was incompetent for three or four years prior to August, 1950.

Dr. Francis J. Hamilton testified that he made his first examination at Westport on September 11, 1950. He made the same type of examination as Dr. Gerow. His diagnosis was that Peelle, Sr., was suffering from a recurrent depression with tension and evidences of structural disease of the brain and, at the time of his examination, was incompetent. When asked to set the maximum and minimum limits of this incompetency he made the following answer: "Well, say a minimum of two to three years; maximum possibly ten."

Dr. Lawrence S. Kaplan made an examination in association with Dr. Foster Kennedy on September 9, 1950, at the Westport Sanitarium. The usual psychiatric examination was made by these two doctors and they diagnosed Peelle, Sr., as suffering from arteriosclerosis. Dr. Kaplan testified that he obtained a personal history from the patient which indicated confusion in business dealings, loss of powers of concentration, particularly in regard to his ability to read or remember music, stress, resentment and depression. He concluded that Peelle, Sr., was suffering from an organic mental syndrome secondary to cerebral arteriosclerosis associated with a mental depression. He was of the opinion that Peelle, Sr., was mentally incompetent at the time of his examination and that this mental disease and incompetency in his judgment was prevalent for three or four years prior to his examination. He could not judge accurately as to the exact time it began except to estimate it within a reasonable medical certainty from the severity of the condition in 1950, and from the history of the poor judgment and insight which he demonstrated throughout the years prior to the examination.

Dr. Wall made an examination, both physical and mental, at the Westport Sanitarium on January 23, 1954. He saw the hospital records of the Sanitarium. He gave his opinion that the patient was suffering from psychosis with cerebral arteriosclerosis and that he was incompetent on that date. He ventured the opinion that the patient suffered from the same condition and was incompetent as far back as 1947.

Dr. Jarrett was appointed by a Florida State Court to examine Peelle, Sr., and report on his condition to the Court. He examined the patient on January 24 and 25, 1955, and had before him the records of the Westport Sanitarium as well as other doctors' reports of previous examinations. He concluded that Peelle, Sr., had a chronic brain disease, cerebral arteriosclerosis, that he was psychotic, and incompetent to manage his own affairs. He was of the opinion that he was incompetent at the time of his examination and that based upon the testimony of the previous doctors he was of the opinion that Peelle, Sr., was incompetent as far back

as 1945. He testified that a person could be incompetent and yet perform habitual everyday acts.

This Court made an order dated July 15, 1955, that Peelle, Sr., was incompetent to stand trial on criminal charges of tax evasion based upon the report of two doctors, Dr. Lichtenstein and Dr. Hyslop. (The Court made this finding pursuant to an application by the attorneys for Peelle, Sr. The order entered found him incompetent on the date of July 15, 1955, and the decision of this Court which resulted in this order did not in any way attempt to decide what Peelle's mental condition was prior to the date of the order.)

The defendant makes the further contention that Peelle, Sr., employed insane methods in attempting to conceal and reduce the taxable income of the company. The defendant points to some of the evidence of Peelle's actions under Part IV as corroborative of his incompetency.

## Part IX

*Plaintiff's Answer to this Evidence*

The defendant introduced testimony pursuant to the first prong of this defense purporting to show that during the prosecution period Peelle, Sr., held various executive offices. He was president and chief executive officer of the Peelle Company. He individually negotiated the purchase of the new subsidiary, Multiscope, Inc., manufacturer of moving stairs. He sold to the Port of New York Authority a contract for thirty such moving stairs. Through the defendant company he was in complete charge of the Richmond Fireproof Door Company in Indiana, a subsidiary of the defendant. He held various posts in the Hudson & Manhattan R. R. Company and was a regular attendant at directors' meetings. During the prosecution period the plaintiff proved Peelle, Sr., held the following positions with the Hudson & Manhattan R. R. Company:

April 11, 1946, elected vice president

June 12, 1947, designated vice president in charge of real estate

December 8, 1947, elected first vice president

April 15, 1948, elected executive vice president

December 8, 1948, elected president

April 14, 1949, elected to executive committee

January 14, 1949, elected vice chairman and chairman executive committee

In addition thereto, he was a director with regular attendance at directors' meetings of the Prudential Savings Bank of Brooklyn. He was also a director until June, 1948, and attended directors' meetings of the Boulevard Bank of Forest Hills. In May of that year as the Boulevard Bank was merged into the Sterling National Bank & Trust Company, Peelle, Sr., went off the board of directors.

The plaintiff called various witnesses who testified as to Peelle's activities during the prosecution period with the Hudson & Manhattan R. R. Company, the Prudential Savings Bank and the Boulevard Bank of Forest Hills.

Paul McGoldrick, a former director of and counsel to the Boulevard Bank, testified that he had frequent business contacts with Peelle, Sr., during the years 1945 to 1949 and particularly noticed his acts, had various conversations with him, and it was his opinion that Peelle, Sr., was perfectly rational.

Robert S. Curtiss who was director for many years of real estate for the Port of New York Authority was frequently in contact with Peelle, Sr., and testified in like manner. Curtiss testified that he was familiar with the symptoms of cerebral arteriosclerosis since his mother had died recently of it. He testified that throughout the period 1946 to 1949 he saw none of these symptoms in Peelle, Sr.

LeRoy P. Petersen, president of the Otis Elevator Company testified for the plaintiff. One of the facts stressed by the psychiatrists as important in their basis of fixing the date of the onset of Peelle's incompetency was that the Otis

Elevator Company in 1947 had arrived at a conclusion to manufacture its own doors. They were a valuable monetary customer of the defendant. This fact upset Peelle, Sr. It was an important factor in Peelle's history which resulted in the pre-dating of the incompetency back of the original date of the examination at the Westport Sanitarium in August, 1950. It appears from Mr. Petersen's testimony that he had a conversation with Peelle a few months prior to 1949 and he stated to Peelle that Otis had not reached any definite conclusion as to the manufacturing of its own doors. Petersen testified that some time in 1949 they reached a conclusion to manufacture doors and he notified Peelle to that effect. Peelle expressed regret but displayed no shock. It appears further that through the years 1947, 1948 and part of 1949 the defendant was manufacturing doors for the Otis account.

Petersen further testified that while Peelle expressed regret that Otis was to manufacture its own doors he noticed that there were no unusual circumstances attached to it. In 1949, Petersen suggested that Otis might buy the defendant's business. Peelle expressed no interest in that matter. He testified that Otis had been doing business with the defendant since 1921 and was a large customer. At the time that Peelle expressed his regret Petersen noticed no extraordinary demonstration on his part or expression of anything but regret at losing an important customer.

Pursuant to the first prong of this defense the record discloses this additional testimony. The defendant employed hundreds of people. The operation of its business was well managed and apparently very profitable. It seems that not only was it well managed but it was a well trained and a cohesive organization. This was the result of the know-how, experience and good work of all the officers during the tax period in question. Peelle, Sr., was its fountainhead. The other officers rendered valuable and experienced assistance. The defendant was not in any sense, as suggested, a one-man corporation. The plaintiff contends basically that it is inconceivable to believe that Peelle, Sr., was incompetent during this four-year period in view of the fact that the defendant was not only well managed but showed substantial profits.

In view of this history of his activities from 1945 to 1950, I cannot accept the opinion of the psychiatrists who testified that Peelle, Sr., was incompetent as early as 1940. One of these psychiatrists testified that it would have helped him immeasurably in forming his opinion if he knew Peelle's history from outside sources. Another psychiatrist testified that assuming that the activities which have just been depicted were prevalent he would still adhere to his opinion that Peelle, Sr., was incompetent. The evidence as to his activities from 1945 to the beginning of 1950 sharply reflect a normal competent individual. The Court realizes that psychiatrists employed by the defendant can facetiously, and this word is used in its broadest sense, express an opinion. This testimony may be considered but it is not determinative. The evidence of lay witnesses can well be determinative.

The second prong of this defense relates to the other officers. Their testimony has been summarized briefly. The record is a voluminous one. These other officers who served with Peelle, Sr., owed a duty and obligation to the company and the offices which they held. It would be repetitious to repeat what has already been said as to their daily activities. These officers owed the duty of discharging their duties and obligations which entailed a perusal of books, balance sheets, profit and loss of the company and what the income tax returns contained. This latter part is particularly appropriate to the officer who signed the income tax return with Henry E. Pellee, Sr. The evidence strongly suggests these officers played an important part in the direction of the business and the profits derived from the operation of the company.

## Part X

### Law as to Incompetency

The defendant has the burden of proving incompetency.

In United States v. Harriman, D.C. S.D.N.Y., 4 F.Supp. 186, the question arose as to whether the defendant was mentally capable of standing trial in a criminal action. In that opinion the court stated as follows at page 188:

"Testimony as to the facts with respect to the present mental condition of the defendant or laying a basis for the forming of a judgment as to his present mental condition is as important as are expressions of opinion by experts. The court naturally will be assisted by the opinions of experts. Nevertheless, in this case, as in all cases in which expert testimony is received, it is not binding. It is merely to be considered as of possible assistance to the court in reaching a conclusion."

The case of DeBruin v. DeBruin, 90 U.S.App.D.C. 236, 195 F.2d 763, was an action for divorce. As to mental capacity the United States Court of Appeals used this language 195 F.2d at pages 763–764:

"The conclusion of the trial court with regard to appellee's mental capacity was based upon the testimony of laymen and of a physician who was not a psychiatrist. This was not error. '[A]s a general rule the admissibility of the evidence of lay witnesses to the mental capacity of a testator is a matter in the sound discretion of the trial court.'[1] There is no reason which would justify the application of a different rule in the present case. Thus, laymen who have had a particularly good vantage point for observing the person under scrutiny may express their opinions as to mental capacity to court or jurors who have not had such an opportunity. And the court or jurors are the reasonable men who may find the truth therefrom. * * *"

"[1] Obold v. Obold, 1947, 82 U.S. App.D.C. 268, 163 F.2d 32, 33. * * *"

In the case of Connecticut Mutual Life Ins. Co. v. Lathrop, 111 U.S. 612, at pages 621–622, 4 S.Ct. 533, at page 537, 28 L.Ed. 536, the United States Supreme Court in a very long and exhaustive opinion made the following comment:

"The jury, being informed as to the witness' opportunities to know all the circumstances, and of the reasons upon which he rests his statement as to the ultimate general fact of sanity or insanity, are able to test the accuracy or soundness of the opinion expressed, and thus, by using the ordinary means for the ascertainment of truth, reach the ends of substantial justice.

"These views are sustained by a very large number of adjudications in the courts of this country, some of which are cited in the margin. * * * In several of those cited the whole subject was very fully considered in all its aspects. * * *"

## Part XI

### Findings of Fact as to Incompetency

1. That Henry E. Peelle, Sr., was competent during the taxable years in question. (The Court is constrained to find that Peelle's normal activities during the prosecution period, as testified to by the lay witnesses, are of greater weight in making a decision as to incompetency than the psychiatrists who first saw Peelle, Sr., in 1950.)

2. That assuming *arguendo* Henry E. Peelle, Sr., was not competent during the four taxable years in question, the Court finds that the other officers took an active part in the management and affairs of the defendant company and that in the discharge of their duties these so-called outside bank accounts could have been readily discovered. Many of the other fraudulent acts could likewise have been discovered.

## Part XII

### Embezzlement—Defendant's Affirmative Defense

It is conceded that $678,461.22 was deposited in the so-called outside bank accounts. It is undisputed that Peelle, Sr., withdrew most of these moneys so deposited. Of these moneys, $2,565 was traced to John W. Peelle (Deft. Ex. L). It is undisputed that in September, 1948, the defendant by a resolution of the board of directors authorized the opening of the account in the Pennsylvania Exchange Bank. Likewise, on October 7, 1948, a resolution was passed by the board of directors designating the Corn Exchange Bank Trust Company. A long time prior thereto there was also a resolution directing the opening of the account in the Boulevard Bank. A vast majority of the checks drawn against these outside accounts was for money to the individual benefit of Peelle, Sr. The control of these accounts forms the basis of the defense of embezzlement.

The defendant claims that it sustained embezzlement losses for the taxable period by reason of the defalcations of its principal officer, Henry E. Peelle, Sr. It refers especially to the so-called outside bank accounts opened admittedly as a result of proper resolutions passed by the directors.

Sidney A. Kaplan, the accountant for the Receiver, testified that between 1950 and 1951 Peelle, Sr., made restitution in cash and securities in the sum of $549,024.90. This appears on the records of the defendant's books. John J. Van Benten who was the accountant for the defendant testified that in addition to this cash and securities Peelle, Sr., surrendered certain life insurance policies in the cash surrender value of $112,531.07. Peelle, Sr., canceled notes which he held of the defendant company to the extent of $158,238.73. (It does not appear from the evidence what the consideration was for these notes.) The total restitution accordingly amounted to $819,794.70. The plaintiff does not dispute this evidence of restitution. This restitution, the defendant contends, is tantamount to an admission that Henry E. Peelle, Sr., embezzled funds of the defendant company.

## Part XIII

### Law as to Embezzlement

The following cases cited by the defendant are not in point: United States v. Lewis, 340 U.S. 590, 71 S.Ct. 522, 95 L.Ed. 560; Arrowsmith v. Commissioner, 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6; Borden v. Commissioner, 2 Cir., 101 F.2d 44; and Security Flour Mills Co. v. Commissioner, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725.

The defendant cited Earle v. Commissioner, 2 Cir., 72 F.2d 366, where a son embezzled securities of his father without any return being made. It allowed the father to deduct from his own personal taxes the loss thus sustained.

J. J. Dix, Inc., v. Commissioner, 2 Cir., 223 F.2d 436, decided June 2, 1955, is a case where it was undisputed that the corporation during the taxable period realized a large sum of money which was secretly deposited in two banks and that the amounts so received were not recorded on its books or in its gross receipts on its tax returns. The Commissioner in determining the deficiency increased the corporation's annual sales income without allowing a deduction because it was not recorded on the corporation's books as required by Sections 41 and 54(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. §§ 41, 54(a). This circuit affirmed that determination. The following language was used in that opinion, at page 437:

> "Moreover, there was no proof that the corporation will not recover from Jacob's estate whatever amounts he did misappropriate."

In George M. Still, Inc., v. Commissioner, 2 Cir., 218 F.2d 639, there was a misappropriation by two taxpayer's officers of a large amount of money. The deficiency resulted from a failure to report sales. The Tax Court ruled that the loss was otherwise compensated for by reason of the embezzlers' promises to make restitution. The promise to pay was ruled as a contract obligation. The

tax returns were made on an accrual basis as in the instant case. Accord Kann v. Commissioner, 3 Cir., 210 F.2d 247; and United States v. Currier Lumber Co., D.C.Mass., 70 F.Supp. 219.

The plaintiff's contention is that under Section 23(f) of the Internal Revenue Code of 1939, 26 U.S.C. § 23(f), a corporate taxpayer is not entitled to an embezzlement deduction unless it is shown that the corporation will not recover the amounts which allegedly had been embezzled.

The plaintiff distinguishes Summerill Tubing Co., 1937, 36 B.T.A. 347. In that particular case the corporation claimed a deduction in respect to moneys taken from the corporation by reason of fictitious purchases. The deduction was allowed on the ground that the corporation had never been compensated for its loss. This rule was reiterated in the case of Charles D. Whitney, 13 T.C. 897, as follows at page 901:

> "Losses, to be deductible under the revenue laws, must be actual, realized losses, and in any case where there is a reasonable ground for reimbursement the taxpayer must seek his redress and may not secure a loss deduction until he establishes that no recovery may be had.
> * * * "

In South Dakota Concrete Products Co., 26 B.T.A. 1429, the Board of Tax Appeals, on October 31, 1932, ruled that amounts embezzled in the years 1923, 1924 and 1925 by a bookkeeper and recovered in 1926 must be reported as income for the year of the recovery.

In Schwabacher Hardware Co., 45 B.T.A. 699, funds were embezzled by one of petitioner's employees and in a later year the petitioner was reimbursed for a portion of the embezzlement. It was held that the petitioner may not deduct losses for the taxable year for which it was subsequently reimbursed.

In Grenada Bank, 32 B.T.A. 1290, the Board of Tax Appeals found no proof of any promise to repay embezzled moneys.

The overwhelming weight of authorities cited bars any tax reduction where the taxpayer is reimbursed. The cases go further. When there appears a promise to pay embezzled money, or there appears a reasonable ground for reimbursement to the taxpayer, a tax reduction is not allowed.

### Part XIV
### *Findings of Fact as to Embezzlement*

1. That Henry E. Peelle, Sr., deposited in these three so-called outside bank accounts moneys belonging to the defendant company to the extent of $678,461.22.

2. That Henry E. Peelle, Sr., individually controlled these so-called outside bank accounts.

3. That the minute books of the defendant company contained resolutions permitting the opening of these three bank accounts.

4. That it was the duty of the officers for each of the years 1945, 1947, 1948 and 1949 to examine the books and balance sheets and to generally have knowledge of the assets and liabilities of the defendant at the end of each year.

5. That full restitution was made in 1950 and 1951 to the defendant of the moneys claimed to have been embezzled by Henry E. Peelle, Sr.

6. That this restitution is a complete defense to the claim of embezzlement.

### Part XV
### *Conclusions of Law*

1. That the income tax return filed by the defendant for the years 1945, 1947, 1948 and 1949 did not include the proper gross income of the defendant corporation and, therefore, they were fraudulent.

2. That the officers of the defendant corporation were responsible for the filing of proper income tax returns, reflecting the true income of the defendant, upon which a proper tax should have been paid.

3. That the officers of the defendant corporation were guilty of fraud in the filing of these income tax returns for the four tax years in question.

924

4. That Henry E. Peelle, Sr., was competent in 1945, 1947, 1948 and 1949.

5. Assuming *arguendo* that Henry E. Peelle, Sr., was not competent, it was the duty and obligation of the other officers to supervise the finances of the defendant corporation, be cognizant of its assets and liabilities, file proper income tax returns and pay the tax due thereon.

6. That Henry E. Peelle, Sr., converted to his own use a substantial amount of money deposited in the three so-called outside banks throughout the four-year tax period.

7. That in 1950 and 1951, complete restitution of this money so converted was made to the defendant corporation by Henry E. Peelle, Sr.

8. That this restitution is a complete defense to the claim of embezzlement.

Both sides may submit additional findings of fact and conclusions of law in accordance with this decision. They must be submitted within a period of ten days from the date of the filing of this opinion.

The Court directs that a decree be submitted in accordance with this decision within a period of ten days.